JOHN L. MORTENSEN AND BARBARA MORTENSEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mortensen v. Commissioner
Docket No. 4516-78.
United States Tax Court
T.C. Memo 1984-600; 1984 Tax Ct. Memo LEXIS 74; 49 T.C.M. (CCH) 94; T.C.M. (RIA) 84600; November 19, 1984. *74 Respondent disallowed petitioners' claimed deduction in 1974 of prepaid interest expense incurred in financing purchases of spot silver (a so-called cash and carry tax shelter) on the grounds that such deduction created a material distortion of income. In an amended answer respondent further asserted that the transactions were shams, lacking economic reality. The loans were nonrecourse with repayment due on a date corresponding to the delivery date of petitioner's short sale position. Iterest was due immediately and was in fact paid. Petitioner made a profit. Held, while an interest deduction was no doubt one of petitioner's goals, he did make a profit, leaving tax benefits aside, and he did pay interest. Respondent did not carry his burden of proof that the transactions were shams and not entered into for profit. Held further, prepayment of interest distorted income and deduction must be reallocated over life of loan. Remo Tinti, for the petitioners. Kendall C. Jones, for the respondent. STERRETT MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated February 2, 1978, respondent determined a deficiency of $16,795 in petitioners' Federal income *75 tax for the taxable year 1974. Additionally, in an amendment to his answer, respondent increased the deficiency in petitioners' income tax for the taxable year 1974 to a total deficiency of $17,233. After concessions, the sole remaining issue for decision is whether petitioners' claimed interest expense incurred in connection with several financed purchases of silver should be disallowed because (1) the transactions were shams and lacked economic substance; or (2) the interest payments materially distorted petitioners' income. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The first stipulation of facts, second stipulation of facts, and exhibits attached thereto are incorporated herein by this reference. Petitioners, John L. Mortensen (Mortensen) and Barbara Mortensen, were residents of Weston, Connecticut at the time of filing their petition in this case. They filed a joint Federal income tax return for the year 1974 with the Internal Revenue Service Center in Holtsville, New York. Barbara Mortensen is a party to this action solely by virtue of having filed a joint return with her husband for the taxable year in question. During 1974 Mortensen was *76 employed by the New York brokerage firm of Vilas & Hickey where his primary responsibility was assisting in the management of approximately 2,000 discretionary accounts. He considers himself to be knowledgeable with respect to commodity trading. All the transactions in question concerning petitioners were conducted with Rudolf Wolff & Co., Ltd. (Rudolf Wolff), a London brokerage firm. Mortensen regularly and frequently communicated directly with Rudolf Wolff in the course of his work at Vilas & Hickey. It was through these continuous dealings with Rudolf Wolff that Mortensen first learned of the silver cash and carry transactions. Basically, the silver cash and carry transactions marketed by Rudolf Wolff involved a purchase of silver along with a corresponding short sale of silver. This means that the customer, at the same time he purchases the silver, agrees to deliver the same amount of silver at a specified point in the future for a specified price. In order to pay for the initial purchase of silver, the customer borrows the entire purchase price and deducts the interest in the year of purchase. However, because the sales price of the short silver generally exceeds the purchase *77 price of the spot silver by an amount roughly equivalent to the interest charge, there is no commensurate outlay of cash. Furthermore, when the taxpayer eventually sells the spot silver, the gain on such sale will normally qualify for long-term capital gain treatment. Rudolf Wolff marketed the silver cash and carry transactions as a means of converting ordinary income into capital gains. The silver cash and carry transactions were described in a Rudolf Wolff document in circulation during the years 1973 through 1975 as follows: EXAMPLE OF HOW ORDINARY INCOME CAN BE CONVERTED TO CAPITAL GAINS BY THE HOLDING OF SILVER FOR A PERIOD In this example the client wishes to convert approximately $100,000 of ordinary income to capital gains. On 4th June he buys 30 lots of 10,000 ozs each for delivery 11th June at 195.88p per oz, and at the same time sells 30 lots for delivery 13th December at 210.00p per oz. On 11th June he has to take up the silver he has purchased. The invoice amount of the purchase is [British pounds] 587,400. This amount is provided for the client by a finance house in London, and he is charged interest on the amount for the period of the loan, ie. until the redelivery *78 of the silver. In this example interest at 14% for 185 days amounts to $41,681.26 (which [at] $2.40 equals $100,035.02). The storage and insurance for the period comes to [British pounds] 225, and the net sales price comes to [British pounds] 629,606.25. Deducting the cost plus the rent and insurance from the net sales, one is left with a gain of [British pounds] 41,981.25, which after deduction of the interest leaves a profit of [British pounds] 299.99, which is equal to $719.98. In arrivingat this answer, we have charged merely a nominal commission of 1/16% and have borrowed money from the finance house at rather cheaper rates than existing market rates, and in this way we have been able to show a profit. There are, of course, further charges to be made which include additional commission and further bank fees. In this example these amount to $5,720.00. Therefore interest charged equals $100,035.00, net gain $100,755.00 less $5,720.00 equals $95,035.00, which gives a dollar cost of $5,000.00 equal to $4.998%. From this you will see that the operation will cost approximately [illegible] ie. with an interest charge of $100,000 you will receive a net gain of $95,000 at the completion *79 of the operation. The following promotional document which details the desired tax results of these transactions was also used as part of a sales package during the tax years at issue: [See Illustration in Original] This promotional document does not refer to any profit potential but rather emphasizes the fact that a tax deduction of $20,000 was sought. The document represents that financing will be handled by the firm of I. Rochester, Ltd. Petitioner Mortensen entered into two series of silver cash and carry transactions with Rudolf Wolff. Both series of transactions were initiated in December of 1974 and involved alleged loans from I. Rochester in connection with the purchase of silver. In his initial series of transactions, Mortensen's transaction documents, dated December 20, 1974, confirm a purchase of 45,000 ounces of spot silver at a total cost of 86,175 British pounds, or 191.50 pence per ounce. However, concurrent with this alleged purchase of spot silver, Mortensen received other transaction documents from Rudolf Wolff, also dated December 20, 1974, that reflect two short sales of silver in which only the price varied. According to Mortensen's transaction documents, *80 Mortensen sold 20,000 ounces of silver for delivery on July 14, 1975 at a total price of 41,260 British pounds, or 206.30 pence per ounce; and 25,000 ounces of silver also for delivery on July 14, 1975 at a total price of 51,550 British pounds, or 206.20 pence per ounce. In connection with Mortensen's initial purchase of 45,000 ounces of spot silver, he received a letter from I. Rochester, dated December 20, 1974, confirming its agreement to loan Mortensen the full purchase price of 86,175 British pounds. The December 20, 1974 letter provided that I. Rochester would transfer the full amount of the loan directly to Mortensen's account with Rudolf Wolff so that Mortensen would not have personal possession or control over the loan proceeds. According to the terms spelled out in the letter, I. Rochester would not hold Mortensen personally liable for repayment of the loan but rather would look solely to the proceeds from the sale of the 45,000 ounces of silver. Repayment of the loan was due on July 14, 1975, the date corresponding to the delivery date for Mortensen's short sale position in the first series of transactions, and was to be made by Rodolf Wolff directly to I. Rochester. *81 Thus, Mortensen also would not have personal possession or control of the proceeds from the sale of silver committed to the repayment of the loan. The December 20, 1974 letter further provided that I. Rochester would debit Mortensen separately for the interest, which was stated at 13-1/2 percent; and that all such interest would be due immediately. In a separate letter dated December 23, 1974 captioned "Debit Notice," I. Rochester billed Mortensen for $15,010.88 of interest representing 13-1/2 percent interest for the period December 23, 1974 through July 14, 1975. In addition, Mortensen received another letter from I. Rochester dated January 6, 1975in which it acknowledged receiving such interest from Mortensen on December 30, 1974. In actuality, the $15,010.88 interest payment on December 30, 1974 was made by Vilas & Hickey to I. Rochester's account at American Bank and Trust Company in New York City. [1] *82 On the same date, Mortensen delivered to Vilas & Hickey a personal check for $15,000 payable to Vilas & Hickey, which then debited Mortensen's account at the firm for $15,010.88. [2]
Mortensen also purportedly entered into a second series of transactions on December 30, 1974. On that date, Mortensen's transaction documents confirm a purchase of 73,000 ounces of sopt silver for December 31, 1974 delivery at a total cost of 142,861 British pounds, or 195.70 pence per ounce; and a short sale of 73,000 ounces of silver for delivery on June 10, 1975 as a total price of 153,884 British pounds, or 210.80 pence per ounce. As was the case with the first series of transactions, Mortensen financed the purchase of spot silver through I. Rochester. In a letter dated December 30, 1974, I. Rochester agreed to loan Mortensen the entire purchase price of 142,861 British pounds under the same terms as the loan to purchase 45,000 ounces of silver on December 20, 1974. The December 30, 1974 letter provided *83 that repayment of the loan was due on June 12, 1975; however, the interest on such loan was again due immediately. In a separate letter dated December 31, 1974 captioned "Debit Notice," I. Rochester billed Mortensen for $19,981.59, representing interest at 13-1/2 percent on the loan balance of 142,861 British pounds for a period of 163 days from December 31, 1974 through June 12, 1975. Additionally, Mortensen also received a separate, undated letter from I. Rochester acknowledging receipt of such interest from Mortensen on December 31, 1974. According to Mortensen, this interest payment was made at his behest by Rudolf Wolff. At the time Mortensen initiated the second silver cash and carry transaction series, he did not have sufficient funds to enable him to pay the $19,981.59 of interest due to I. Rochester. Consequently, Mortensen approached Rudolf Wolff, which agreed to forward such interest payment on his behalf. Mortensen subsequently reimbursed Rudolf Wolff for making such interest payment by obtaining from his friend, Ken Schwartz, a check which he forwarded to Rudolf Wolff. Mortensen's substantiation for such interest payment is a personal check of $20,000 drawn on the *84 Chase Manhattan Bank account of Sattva Trading Co., Inc. (Sattva), signed by Ken Schwartz and made payable to "Rudolf Wolff and Company, Ltd." The $20,000 Sattva check is dated December 27, 1974 and bears the handwritten notation "For acct. of John Mortensen, 50 Jane St., N.Y., N.Y." However, Ken Schwartz testified that the $20,000 check was probably written on February 27, 1975. According to Mortensen the check was backdated at his request for his own bookkeeping purposes. The $20,000 Sattva check was deposited to Rudolf Wolff's account at Banker's Trust Company, London Office, on March 5, 1975. On schedule A of their 1974 Federal income tax return, petitioners claimed an interest deduction in the amount of $35,011. Of this amount, $34,992.47 was attributable to the two interest payments made to I. Rochester with respect to Mortensen's loans to purchase silver. According to Mortensen's transaction documents, his next dealings with Rudolf Wolff occurred when he closed out his second series of transactions on June 10, 1975. On that date, Mortensen's transaction documents reflect a sale of the 73,000 ounces of spot silver purchased on December 30, 1974, and a purchase of 73,000 ounces *85 of silver for June 10, 1975 delivery to close his December 30, 1974 "short" position. Mortensen failed to introduce any evidence which substantiated the prices of the alleged June 10, 1975 transactions. However, the Mortensens did report $23,490 of short-term capital gain on schedule D of their 1975 Federal income tax return attributable to the second series of Rudolf Wolff silver transactions. Mortensen's first series of transactions were subsequently closed out on July 9, 1975. According to his transaction documents, on that date Mortensen sold the 45,000 ounces of spot silver purchased on December 20, 1974 for delivery on July 15, 1975. The total price received on such sale was 95,085 British pounds, or 211.30 pence per ounce. Additionally, Mortensen's transaction documents confirm a purchase of 45,000 ounces of silver for July 14, 1975 delivery which was used to close his initial "short" position established on December 20, 1974. The total cost of the purchase was 95,085 British pounds, or 211.30 pence per ounce. On their schedule D attached to their joint Federal income tax return for 1975, petitioners reported a long-term capital gain of $13,680.03 attributable to the first *86 series of Rudolf Wolff silver transactions. This amount was actually a net figure comprised of a short-term loss and a long-term gain and was computed as follows: 12/20/74 "short" transaction
20,000 oz.
41,260   25,000 oz.
51,550   Total selling price
92,810   British pounds
7/5/75 Closing transaction
45,000 oz./cost
95,085   Net loss
(2,275)  British pounds
Long-term gain: 12/20/74 "spot" transaction
45,000 oz./cost
86,175   7/9/75
sale "spot"
45,000 oz./price
95,085   Net gain
8,910   British pounds
Computation of net gain/loss: long-term gain
8,910   less short-term loss
2,275   Net long-term gain
6,635   British pounds
Rate of exchange on 7/9/75
(British pounds: U.S. Dollar)
2.061798
X6,635   Net long-term gain reported
13,680.03     Mortensen did not personally select any of the dates or prices in the two series of silver transactions he entered into with Rudolf Wolff. He also did not even contemplate taking delivery of the silver and was not in a position to expose himself to a great deal of loss. In his notice of deficiency, respondent reduced petitioners' claimed deduction for interest expense by $34,204 on the ground that such amount represented prepaid interest which created a material distortion *87 of petitioners' income. Petitioners contested respondent's disallowance in a petition timely filed with this Court. Subsequently, some 4 years later, respondent filed an amendment to his answer in which he increased the deficiency in income tax due from petitioners from $16,795 to $17,223 on the following stated grounds: (d) In the statutory notice of deficiency for 1974, dated February 2, 1978, upon which notice the above-captioned case is based, the respondent disallowed $34,204 of the claimed $35,011 interest deduction; $807 of the deduction was not disallowed in that notice. (c) The $807 of claimed interest expense, as well as the $34,204 (or a total of $35,011), cannot be deducted because the transactions underlying the claimed deduction did not occur or did not occur as claimed. The taxpayers have not substantiated the claimed deduction, nor have they established an underlying, bona fide indebtedness. Further, the underlying transactions constituted an integrated transaction and lacked economic substance, being entered into solely for tax purposes. No genuine interest expense was incurred by the taxpayers. OPINION The sole issue for our decision in this case is the deductibility *88 of certain interest expenses incurred by Mortensen in connection with his financed purchases of silver. In his notice of deficiency, respondent disallowed $34,204 of claimed deductions for prepaid interest on the grounds that such deductions created a material distortion of petitioners' income for 1974. With respect to this issue, it is petitioners who must bear the burden of proof. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. However, in his amended answer filed roughly 4 years after the issuance of the notice of deficiency in this case, respondent increased the amount of the deficiency by disallowing an additional $807 of interest incurred by Mortensen in connection with his financed purchases of silver. Additionally, respondent asserted as new grounds for his disallowance of not only the additional $807 but the original $34,204 as well that the transactions underlying such deductions were shams and lacked economic substance. With respect to both the increased deficiency and the new grounds, it is clear, and indeed respondent concedes, that the burden of proof is on respondent. McSpadden v. Commissioner,50 T.C. 478, 493 (1968). *89 In light of the fact that the new grounds asserted by respondent relate to the ultimate deductibility of the claimed interest payments, rather than merely to the correct timing of such deductions, we will focus first on the grounds asserted in respondent's amended answer. Section 163 provides, with exceptionsand limitations not relevant herein, that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." For purposes of section 163, the term "interest" denotes that which is paid for the use of borrowed funds or compensation for the use or forebearance of money. Old Colony R. Co. v. Commissioner,284 U.S. 552, 560 (1932); Deputy v. Du Pont,308 U.S. 488, 498 (1940). The "indebtedness" upon which such a payment is made must be an "existing, unconditional, and legally enforcible obligation." Kovtun v. Commissioner,54 T.C. 331, 338 (1970), affd. per curiam 448 F.2d 1268 (9th Cir. 1971); Titcher v. Commissioner,57 T.C. 315, 322 (1971). In determining whether a payment constitutes interest on indebtedness, economic realities govern over the form in which a transaction is cast. Knetsch v. United States,364 U.S. 361, 366 (1960); Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966). *90 In the instant case, petitioners claimed deductions amounting to $35,011 on their 1974 Federal income tax return for interest expenses in connection with two series of cash and carry silver transactions conducted with Rudolf Wolff. The transactions entered into by Mortensen basically involved the purchase on a wholly financed basis of spot silver along with a nearly simultaneous short sale of an equal amount of silver for delivery at a later date. Both the prices and dates of these transactions were determined by Rudolf Wolff. The financing for the purchaseprices of the spot silver bought in these transactions was handled by means of loans from I. Rochester, Ltd., a foreign entity. These loans were nonrecourse with repayment due on a date corresponding to the delivery date of the short sale positions established in connection with Mortensen's initial purchases of spot silver. However, the interest on such loans was due immediately. Consequently, Mortensen's financed purchases of spot silver were designed to yield immediate interest deductions with the eventual net gains realized on the subsequent sales of the spot silver and closing out of the short sale positions being accorded *91 capital gains treatment. The tax treatment of the so-called "cash and carry tax shelter" was addressed by Congress in section 263(g) which was added to the Code as part of the Economic Recovery Tax Act of 1981. Under section 263(g), the carrying charges of such transactions, including interest expense, are required to be capitalized. However, section 263(g) is only applicable to cash and carry straddles entered into after June 23, 1981. Therefore, since the tax year involved in the present case is 1974, we must decide this case under the law as it existed prior to section 263(g). As previously stated, respondent bears the burden of proof with respect to all issues asserted in his amended answer. Basically, respondent's position in his amended answer is that the transactions entered into by Mortensen lacked economic substance and were prompted solely by his desire to achieve an interest deduction. Additionally, respondent asserts that no interest was actually paid in connection with the transactions in question. We note at the outset that we have previously recognized that amounts denominated as interest cannot be deducted where the underlying transaction was a sham. Derr v. Commissioner,77 T.C. 708, 730 (1981). *92 Furthermore, "Section 163(a) does not 'intend' that taxpayers should be permitted deductions for interest paid on debts that were entered into solely in order to obtain a deduction." Goldstein v. Commissioner,supra at 742. The basic thrust of petitioners' position in this case is that the silver cash and carry transactions in question were entered into with the expectation of making a profit. In this respect, petitioners argue that the potential for profit existed by purchasing and subsequently reselling silver. According to Mortensen, he initially purchased spot silver and held it, hoping to make a profit, prior to initiating his short sale position. Once the market moved Mortensen would then lock in his profit or loss by establishing a short position. Mortensen recognized that once the short position was established in conjunction with the initial spot purchase, then the profit or loss, except for the possible effect of exchange rates, was "locked in." Respondent naturally disagrees with petitioners' claimed objectives pointing out that, according to Mortensen's transaction documents, the short sales in question occurred nearly simultaneously with the initial purchases of spot *93 silver. However, although we concur with respondent that the attainment of an interest deduction was certainly one of the reasons why Mortensen entered into the transactions in question, the evidence in the instant case reflects that, even by respondent's own calculations, Mortensen did indeed make a profit. According to his transactions documents, in his first series of transactions Mortensen purchased 45,000 ounces of spot silver on December 20, 1974 at a total cost of 86,175 British pounds. Mortensen subsequently sold this spot silver on July 9, 1975 at a total price of 95,085 British pounds. Thus, Mortensen realized a net gain from the purchase of spot silver on December 20, 1974 and the sale of such spot silver on July 9, 1975 of 8,910 British pounds. Additionally, according to his transaction documents Mortensen sold short 45,000 ounces of silver on December 20, 1974 for future delivery at a total price of 92,810 British pounds. Mortensen eventually closed this short position by buying 45,000 ounces of silver on July 9, 1975 at a total cost of 95,085 British pounds. Thus, Mortensen realized a net loss from the closing of his short position of 2,275 British pounds. Viewed as *94 a whole, Mortensen locked in profit of 6,635 British pounds in his first series of transactions from the purchase and short sale of silver on December 20, 1974. However, in order to compute his true transaction profit or loss, Mortensen's cost of borrowing must also be factored into the calculation. Under the terms of his loan arrangement with I. Rochester, Mortensen borrowed 86,175 British pounds for a period of 203 days at an interest rate of 13.5 percent. Accordingly, the total cost of borrowing the purchase price for the 45,000 ounces of spot silver was 6,470.21 British pounds. Thus, when this amount is subtracted from the profit of 6,635 British pounds locked in on December 20, 1974, we arrive at a net transaction profit of 164.79 British pounds. Although Mortensen's profit reflected in his transaction documents from his first series of cash and carry silver transactions was not substantial, nevertheless, he did realize a profit. Furthermore,Mortensen also realized a net transaction profit from his second series of cash and carry silver transactions which was considerably larger in amount. According to his transaction documents, in his second series of transactions instituted *95 on December 30, 1974, Mortensen purchased 73,000 ounces of spot silver at a total cost of 142,861 British pounds and sold a similar amount of silver for future delivery at a total price of 153,884 British pounds. Thus, Mortensen locked in a profit of 11,023 British pounds from the purchase and short sale of silver on December 30, 1974. Again, however, in order to calculate the true transaction profit or loss from Mortensen's second series of transactions, it is necessary to factor in the cost of financing. Under the terms of the loan arrangement with I. Rochester, Mortensen borrowed 142,861 British pounds for a period of 163 days at an interest rate of 13.5 percent. Accordingly, the total cost of borrowing the purchase price for the 73,000 ounces of spot silver purchased on December 30, 1974 was 8,612.75 British pounds. Thus, when this amount is subtracted from the profit of 11,023 British pounds locked in on December 30, 1974, the net transaction profit derived by Mortensen from the second series of transactions was 2,410.25 British pounds. We find the fact that petitioners realized a profit in both series of silver cash and carry transactions to be of utmost importance.Furthermore, *96 not only did petitioners realize a profit on both transactions but by respondent's own calculations petitioners also reported a combined net profit of $2,177.56 from the two series of transactions on their Federal income tax returns for 1974 and 1975. [3] *97 We recognize that petitioners may well have been among the fortunate few investors who realized a profit. Nonetheless, in view of the fact that there was a locked-in profit at the time in which Mortensen took out the loans in question, we find it impossible to hold that respondent has carried his burden of proving that the debts to I. Rochester were incurred solely in order to obtain a deduction. [4] Quite simply, Mortensen was better off from having entered into the transactions in question than he would have been without having done so, irrespective of tax consequences. Consequently, the fact that petitioners also achieved an interest deduction on their Federal income tax return was merely icing on the cake. Having decided that respondent has failed to establish that the debts in question were entered into solely in order to obtain a deduction, we now focus our attention on respondent's contention that no interest was in fact paid by Mortensen. The facts surrounding Mortensen's payments of interest on the loans in question only can be described as bizarre. *98 In neither case did Mortensen make such payments directly to the purported lender, I. Rochester. With respect to the first series of transactions, the required interest payment of $15,010.88 was made on Mortensen's behalf by Vilas & Hickey on December 30, 1974. However, Mortensen did deliver to Vilas & Hickey on the same date a personal check for $15,000 payable to Vilas & Hickey. Mortensen explained that the reason why this interest payment was made by Vilas & Hickey rather than directly by himself was for bookkeeping purposes. With respect to the second series of transactions, the required interest payment of $19,981.59 was made on Mortensen's behalf by Rudolf Wolff. The exact date of this payment is not altogether clear; however, in an undated letter, I. Rochester acknowledged receiving such interest from Mortensen on December 31, 1974. Consequently, in light of the fact that respondent has failed to produce any credible contradicting evidence, we find that such payment was made by Rudolf Wolff on Mortensen's behalf on December 31, 1974. It appears from the evidence that there was no set loan agreement between Mortensen and Rudolf Wolff with respect to its payment of the *99 $19,981.59 of interest; but rather, that such payment was made as a business accommodation to Mortensen because of the relationship between Rudolf Wolff and Mortensen's employer, Vilas & Hickey. Mortensen subsequently repaid the loan to Rudolf Wolff by means of a check for $20,000 drawn on the Chase Manhattan Bank account of Sattva Trading Co., Inc. This check was backdated to December 27, 1974 and was signed by Mortensen's friend, Ken Schwartz, who testified that he was repaid such amount by Mortensen on March 5, 1975. Mortensen's explanation for this loan from Schwartz was that he lacked sufficient funds to pay the $19,981.59 of interest and therefore approached Schwartz to make such payment on his behalf. Mortensen further explained that the check was backdated for bookkeeping purposes. Admittedly, the facts surrounding the interest payments on both series of loans are unusual. However, in both cases the record indicates that there were interest payments made on Mortensen's behalf and that Mortensen did repay these amounts to the parties who made such payments. Consequently, the evidence of actual interest payments in this case is a distinguishing factor between the transactions *100 herein and the transactions in Hirai v. Commissioner,T.C. Memo. 1984-495. As in the instant case, the taxpayer in Hirai engaged in several cash and carry silver transactions with Rudolf Wolff in which I. Rochester was again the purported lender. However, the taxpayer in Hirai never madeany interest payments from his personal funds to either I. Rochester or Rudolf Wolff. We find the actual repayments of interest from Mortensen's personal funds to be a significant distinguishing factor. Furthermore, there is no evidence in the record that the interest payments in question were ever refunded to Mortensen shortly following their payment. We find this to be a significant distinguishing factor between the transactions in this case and the Rudolf Wolff transactions in Julien v. Commissioner,82 T.C. 492 (1984). In Julien, the taxpayer did make actual interest payments from his own funds to the purported lender, I.M. Fortescue (Finance) Limited. However, less than a month after the taxpayer's yearend payment of interest, such interest payment was refunded to the taxpayer by Rudolf Wolff. By contrast, in the instant case there is absolutely no evidence that Mortensen was ever reimbursed *101 for his interest payments made from his own personal funds. In conclusion, although respondent strongly debates whether the interest payments in question were in fact made, he has introduced no credible evidence to support his position. While the matter may not be entirely free from doubt; it is, however, respondent, and not petitioners, who bears the burden of proof on this issue. What evidence there is in the record suggests that the loans were valid and that interest payments were in fact made. While we admit that respondent raises some troubling points, he has simply failed to carry his burden of proof with respect to this issue. Accordingly, we find for petitioners on the issues raised in respondent's amended answer. Finally, in light of this holding, we must now address respondent's alternative position concerning the disallowance of $34,204 of prepaid interest. In his notice of deficiency, respondent disallowed this amount on the grounds that the deduction of such prepaid interest created a material distortion of petitioners' income. Accordingly, we must decide whether the prepaid interest in question was properly deductible in 1974 or instead should have been attributed *102 to 1975. We note at the outset that the taxable year at issue in the present case was prior to the effective date of section 461(g) and is thus controlled by prior law. [5]The general rule for the timing of any deduction is contained in section 461(a) which provides that decuctions shall be taken in "the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." Prior to 1976, a taxpayer reporting income and expenditures in accordance with the cash receipts and disbursements method of accounting was ordinarily entitled under section 163(a) to deduct an interest payment in the year in which such payment was actually made. Lewis v. Commissioner,65 T.C. 625, 628 (1975). However, this general rule is subject to an important and well-recognized exception which disallows such deduction where to deduct such interest would result in a material distortion of income. Sandor v. Commissioner,62 T.C. 469, 477-478 (1974), affd. per curiam 536 F.2d 874 (9th Cir. 1976). In such cases, respondent is empowered by section 446(b) to require that the interest expense be accounted for in some other way in order that the income of the taxpayer is clearly *103 reflected in annual reporting for Federal income tax purposes. Lewis v. Commissioner,supra at 629. Existing authority does not precisely define what constitutes a material distortion of income; however, it is well established that the Commissioner has broad power and discretion in determining whether or not a taxpayer's method of accounting clearly reflects income. Commissioner v. Hansen,360 U.S. 446, 447 (1959); Fort Howard Paper Co. v. Commissioner,49 T.C. 275, 284 (1967). Furthermore, the Commissioner's discretion applies to "the accounting treatment of any item." Sec. 1.446-1(a)(1), Income Tax Regs.; Burck v. Commissioner,63 T.C. 556, 561 (1975), affd. 533 F.2d 768 (2d Cir. 1976). The taxpayer ordinarily bears a heavy burden of proof in establishing that the Commissioner has abused his discretion. Ferrill v. Commissioner,684 F.2d 261, 263 (3d Cir. 1982), affg. per curiam a Memorandum Opinion of this Court. Sandor v. Commissioner,supra at 477. Prior to 1968, the Internal Revenue Service *104 permitted cash basis taxpayers to deduct up to 5 years of prepaid interest from income. However, in that year respondent, with reliance on section 446(b), issued Rev. Rul. 68-643, 1968-2 C.B. 77, which states in pertinent part: The Service now concludes that the deduction of prepaid interest in the year of payment by a taxpayer employing the cash receipts and disbursements method of accounting may not result in a clear reflection of income for the taxable year of payment. A deduction for interest paid in advance on each indebtedness for a period not in excess of 12 months of the taxable year immediately following the taxable year in which the prepayment is made will be considered on a case by case basis to determine whether a material distortion of income has resulted. Some of the factors to be considered in determining whether the deduction of prepaid interest gives rise to a material distortion of income include but are not limited to the amount of income in the taxable year of payment, the income of previous taxable years, the amount of prepaid interest, the time of payment, the reason for prepayment, and the existence of a varying rate of interest over the term of the loan. *105 * * * Where a material distortion of income has been found to result from the deduction of prepaid interest, the Service will require the taxpayer to change his method of accounting with respect to such prepaid interest in order to allocate it over the taxable years involved. Although there is legislative support for the approach taken in Rev. Rul. 68-643, supra, we consider it advisory only. H.Rept. 91-413, 91st Cong., 1st Sess. 73 (1969), 1969-3 C.B. 246. The ruling certainly does not carry the force of law or bind us in the slightest degree. Burck v. Commissioner,supra.Nevertheless, we have previously recognized that the factors outlined in Rev. Rul. 68-643, supra, are useful guides in determining whether a prepayment of interest results in a material distortion of income under section 446(b). Burck v. Commissioner,supra at 562. See also McMullan v. United States,231 Ct. Cl. 378, 686 F.2d 915, 920 (1982). In the instant case, the prepayments of interest by Mortensen were not discretionary, bur rather were required by the terms of his loan agreements with I. Rochester. Both of Mortensen's I. Rochester loan agreements provided "we shall debit you separately for the interest, *106 which shall be due immediately." Thus, on the surface this would appear to be a highly positive factor in favor of petitioners. However, the relevance of this factor is severely mitigated by the fact that, although under the terms of the first loan agreement entered into on December 20, 1974 payment of the interest was due immediately, actual payment of such interest was not made until 10 days later on December 30, 1974. Furthermore, petitioners have failed to offer any evidence as to why prepayment of such interest was required. In light of the fact that the first payment of interest was not made until 10 days after the alleged purchase of silver, it appears indisputable that I. Rochester did not always insist on full prepayment of interest prior to the actual loan in order to protect itself from risk of loss. Accordingly, we accord minimal weight to the fact that Mortensen's loan agreements with I. Rochester required the interest on such loans to be prepaid. Another relevant factor in determining whether a prepayment of interest materially distorts income is the timing of such prepayments. In the instant case, the prepayments of interest were made on December 30, 1974 with respect *107 to the first loan and December 31, 1974 with respect to the second loan.Consequently, the timing of the prepayments of interest in this case appear to have been made at the last possible moment for tax avoidance purposes. Accordingly, the timing of the prepayments of the interest in this case is a factor which weighs heavily against petitioners. Other highly relevant factors in determining whether a prepayment of interest materially distorts income are the amount of income in the taxable year of payment, the income of previous taxable years and the amount of prepaid interest. Although we do not have any information with respect to petitioners' income for previous taxable years, we do have information on petitioners' income for 1975. Petitioners' Federal income tax return for 1974 reveals a total gross income of $57,155 and an adjusted gross income of $53,389. In contrast, petitioners' Federal income tax return for 1975 displays a total and adjusted gross income of only $7,123. Thus, petitioners' adjusted gross income for 1974 was more than seven times larger than their adjusted gross income for 1975; and their total gross income for 1974 was more than eight times larger than *108 the corresponding amount for 1975. Consequently, the petitioners' amount of income for 1974 is a factor which weighs heavily against petitioners. Furthermore, as previously stated, petitioners failed to introduce any evidence with respect to their income in the taxable years previous to 1974.A taxpayer bears a heavy burden of proof in establishing that respondent has abused his discretion in finding a material distortion of income. Sandor v. Commissioner,supra. In light of petitioners' failure to present any evidence demonstrating that their income for 1974 was not extraordinary, the amount of petitioners' income for previous taxable years is also a factor which is negative to petitioners' cause. Probably the most important factor in determining whether a prepayment of interest materially distorts income is the amount of such prepayment. Naturally the importance of a certain dollar amount can only be measured in relevant terms. On their 1974 Federal income tax return, petitioners reported itemized deductions of $39,580 which reduced their income for such year to $13,809. Of these reported itemized deductions, the prepaid interest to I. Rochester accounted for $34,204 of the total *109 amount of $39,580, or over 86 percent. [6] Thus, the prepayment of interest to I.Rochester in December of 1974 effectively eliminated over 64 percent of petitioners' adjusted gross income for the taxable year. Although we would be reluctant to hold that any particular amount of prepaid interest is excessive per se, certainly any payment which eliminates such a huge amount of a taxpayer's income must be looked at with the strictest scrutiny. We find the amount of the prepayment of interest made by petitioners to be a factor of utmost importance which clearly created a material distortion of petitioners' income. In summary, after reviewing all of the facts and circumstances of the matter at hand, we concur with respondent's determination that petitioners' claimed deductions for prepaid interest would result in a material distortion of petitioners' taxable income for 1974. Petitioners, quite simply, have not carried their burden of proof with respect to this issue and we find accordingly. [7] *110 Decision will be entered under Rule 155.
Footnotes
1. On that date, Vilas & Hickey paid $40,029.01 to I. Rochester comprised of two amounts--$15,010.88 and $25,018.13.The $15,010.88 amount related to Mortensen's interest payment to I. Rochester, while the $25,018.13 amount related to Rose Mortensen's interest payment to I. Rochester. 2. Mortensen claimed at trial that the reason he had Vilas & Hickey make the $15,010.88 interest payment to I. Rochester rather than doing so directly himself was for his own bookkeeping purposes.↩
3. Petitioners reported a transaction loss of $1,330.85 from their first series of transactions and a transaction profit of $3,508.41 from their second series of transactions. We note that respondent contends on brief that petitioners actually underreported the profits realized from the silver transactions in question. According to respondent's calculations, Mortensen's actual profit from the two transactions was $5,020.60. 4. We note that respondent makes a point of the fact that petitioners' tax returns do not reflect any insurance, storage or commission charges with respect to the two series of cash and carry silver transactions in question and that such charges would have reduced petitioners' reported gain. However, respondent has failed to produce any evidence that such charges did indeed exist or how significantly such charges would have changed petitioners' overall profit position. Accordingly, in light of the fact that respondent bears the burden of proof with respect to this issue, we find respondent's naked allegations insufficient to change our conclusion.↩
5. Sec. 461(g)↩, which is effective for tax years after 1975, puts a cash basis taxpayer on the accrual basis of accounting with respect to prepayments of interest relating to future periods.
6. The actual interest paid to I. Rochester was $35,011; however, in his notice of deficiency respondent disallowed only $34,204 as prepaid interest.↩
7. In reaching this conclusion, we have taken into account the fact that the prepayment in question were for periods of time substantially less than 1 year. Zaninovich v. Commissioner,69 T.C. 605 (1978), revd. 616 F.2d 429↩ (9th Cir. 1980). Although the period of time following the close of the taxable year to which the payment relates is certainly a relevant consideration, we prefer to base our decisions on the totality of the circumstances rather than a solitary factor.